**Carson Wayne NEWTON, a/k/a Wayne Newton, Plaintiff,**

**v.**

**NATIONAL BROADCASTING COMPANY, INC., a Delaware corporation, et al., Defendants.**

**No. CV–LV–81–180–MDC.**

United States District Court, D. Nevada.

Nov. 18, 1987.

Morton R. Galane, Las Vegas, Nev., for plaintiff.

Floyd Abrams, New York City, for defendants.

DECISION AND ORDER RE DEFEND-
ANTS' MOTION FOR JUDGMENT
NOTWITHSTANDING THE VER-
DICT AND IN THE ALTERNATIVE
FOR A NEW TRIAL.

CROCKER, Senior District Judge.

Defendants' Motions for Judgment N.O.V., New Trial and Remittitur were ar-gued and submitted on September 3 and 4, 1987, at Las Vegas, Nevada.

Defendants contend that they are enti-tled to Judgment N.O.V. because plaintiff failed to prove by clear and convincing evidence that the broadcasts in question were false or made with reckless disregard for their truth or falsity.

The Court is satisfied from its indepen-dent review of all of the evidence in this case that plaintiff has met his burden of proof by clear and convincing evidence.

■ A reckless disregard for truth or falsity requires that defendants have seri-ous subjective doubts as to the truth of the broadcasts. This state of mind can be es-tablished through the cumulation of cir-cumstantial evidence.

■ Since the defendants voluntarily ed-ited and combined the audio with the visual portions of the broadcasts in a way that created the defamatory impressions, the jury could properly find that defendants not only had serious subjective doubts as to the truth of the broadcasts, but also intend-ed to defame the plaintiff.

The clear and inescapable impression made by the broadcasts was that plaintiff did not have enough money to buy the Aladdin Hotel so he called a friend, Guido Penosi, who had ties to organized crime; and that Mr. Penosi helped him raise the money and thus obtained a hidden interest in the Aladdin Hotel.

Defendants knew this impression was de-famatory because giving anyone a hidden interest in a gaming casino is a violation of law, and as such is defamatory and not protected as a statement of opinion.

Defendants also knew this impression was false because Mr. Ross and Mr. Silver-man had attended the hearing before the Nevada Gaming Board where the Valley Bank of Nevada established that it had provided the money for the plaintiff to purchase the Aladdin Hotel.

Defendants also knew this impression was false because Mr. Ross and Mr. Silver-

man had been told by Source "B", Mark Moreno and Agent Shepard that plaintiff called Guido Penosi because of death threats to his daughter and himself. This knowledge is corroborated by Mr. Ross asking plaintiff in the parking lot following the gaming board hearing on September 25, 1980: "Was he [Guido Penosi] ever here to provide for protection or for the protection of your children?"

By creating the impression that plaintiff had a hidden partner in the Aladdin Hotel and not telling the gaming board about it when he was under oath, the broadcast inferred plaintiff had committed perjury which is also a violation of law.

The impression of a hidden interest in the Aladdin Hotel is further advanced by the statement in the broadcast, "A federal grand jury is now investigating the role of Guido Penosi and the mob in Newton's deal for the Aladdin."

Although defendants testified they did not intend the broadcasts to convey a defamatory impression, the evidence is such that the jury was entitled to reject their testimony as incredible and find that defendants must have had serious subjective doubts about the truth of the broadcasts.

The false and defamatory impression that plaintiff received financial help from organized crime to purchase the Aladdin Hotel, even if unintentional, should have been foreseen and shows a reckless disregard for the truth.

There are many other bits of evidence that convince the Court that plaintiff has shown by a cumulation of circumstantial evidence that defendants had serious subjective doubts as to the truth of the broadcasts, so defendants cannot escape liability. Therefore, defendants' Motion for Judgment N.O.V. is denied as to liability.

■ The evidence that defendants made the broadcasts with reckless disregard for their truth or falsity is some evidence of the "ill will and hatred" required to sustain punitive damages under Nevada Rev.Stat. § 41.333.

There is also other evidence of ill will such as the broadcasts that repeated the defamatory impression after plaintiff had asked for a retraction as well as the aggressive and hostile manner of Mr. Ross when he confronted plaintiff after the gaming board hearing on September 25, 1980. Also, Mr. Bunker, chairman of the Nevada Gaming Board, testified that Mr. Ross was unhappy, arrogant and accusatory when the board granted the gaming license to plaintiff. Further, the repeated statements of officials of N.B.C. that they "stand by the broadcasts" overcomes the idea of an honest mistake and bears on the issue of ill will and hatred.

The cumulation of circumstantial evidence supports the jury verdict as to punitive damages.

■ The jury awarded plaintiff $5,000,000.00 for damage to reputation. This award shocks the conscience of the court because the broadcasts did not tarnish his outstanding reputation. His reputation was not damaged with the Nevada Gaming Board because he received another license in 1982. His reputation was not damaged in the financial community because he borrowed $19,000,000.00 in 1982 for an investment in a resort in Pennsylvania. The Governor of Nevada and the Mayor of Las Vegas established Wayne Newton Day in December, 1981, to honor him, and the street from the airport in Las Vegas toward downtown was renamed Wayne Newton Boulevard. In 1981 he was named Republican Man of the Year in the State of Nevada. After the broadcasts in question, plaintiff received the Presidential Medal of Freedom, he has dined at the White House with President and Mrs. Reagan, and was a guest at a state dinner at the White House for Prime Minister Gandhi of India. President Reagan chose plaintiff to be the Grand Marshal of the July 4, 1983, parade in Washington, D.C. and has visited plaintiff in his home in Las Vegas.

This is just some of the evidence that convinces the Court that plaintiff's reputation has not been damaged in the amount awarded by the jury.

However, the jury is entitled to award damages to reputation without proof that harm actually occurred, but it must be a reasonable amount or it will inhibit the exercise of free speech. The Court follows *Nevada Independent Broadcasting v. Allen*, 664 P.2d 337 (1983) [99 Nev. 404], and *Carol Burnett v. National Enquirer*, 7 Media L.Rptr. (BNA) 1321 (Cal.Super.Ct., 1981), 144 Cal.App.3d 991, 193 Cal.Rptr. 206 (1983), *appeal dismissed*, 465 U.S. 1014, 104 S.Ct. 1260, 79 L.Ed.2d 668 (1984), and holds that $50,000.00 is the maximum amount that can reasonably be presumed since the evidence shows that plaintiff still enjoys an outstanding reputation.

■ The jury awarded plaintiff $7,900,-000 for loss of past income, and $1,146,750 for loss of future income.

Plaintiff claims that the defamatory broadcasts caused him to sell his interest in the Aladdin Hotel to his partner, Ed Torres, which terminated his performances at the Aladdin Hotel. This in turn caused him to entertain out of Las Vegas and although his gross income increased, his net income was less.

The uncontradicted testimony is that prior to the broadcasts, plaintiff was earning $165,000 per week; that three or four months after the broadcast of October 6, 1980, Ed Torres agreed to increase this to $200,000 per week; and at the time of trial, plaintiff was paid $250,000 per week.

The evidence established that the disagreement between plaintiff and his partner, Ed Torres, was over how to operate the Aladdin Hotel profitably, and had nothing to do with the broadcasts.

Therefore, plaintiff has failed to establish by a preponderance of the evidence that the broadcasts in question had any causal connection to any alleged loss of past or future income, and these awards are set aside, and judgment N.O.V. is granted to defendants on these damage claims.

■ The jury awarded plaintiff $225,000 for physical and mental suffering. There is ample evidence in the record that plaintiff was very upset over the broadcasts, and was treated for an ulcer attributed to the stress and psychic trauma caused by the broadcasts, so the award is supported by the evidence. The amount, although large, is not unreasonable.

■ The jury awarded plaintiff $5,000,-000 in punitive damages against the defendant National Broadcasting Company, Inc. The award is supported by the evidence, and since N.B.C. has a net worth of $2 billion, the award is not so excessive as to shock the conscience of the Court.

Since the jury awards of some of the damages are excessive and against the weight of the evidence, defendants' motion for a new trial will be granted, and a new trial ordered on the issue of damages, only, in the Central District of California, unless plaintiff files a remittitur within sixty (60) days of all sums except $225,000 for physical and mental injury, $50,000 as presumed damages to reputation, and $5,000,000 in punitive damages.